02-11-037-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00037-CV

 

 


 
 
 The State of Texas
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Little Elm Plaza, Ltd., a Texas Limited Partnership
 and Legacy Bank of Texas
 
 
  
 
 
 APPELLEES
 
 


 

AND

 


 
 
 Little Elm Plaza, Ltd., a Texas Limited Partnership
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

 

FROM THE Probate
Court OF Denton COUNTY

----------

MEMORANDUM OPINION[1]

----------

          In
four issues, the State of Texas (the State) appeals the trial court’s judgment awarding
$2,327,913 to Little Elm Plaza, Ltd. (Little Elm) as damages resulting from the
State’s condemnation of part of Little Elm’s property.  The State requests that
we reverse the trial court’s judgment and remand this case for a new trial.  Little
Elm disagrees with the contentions raised within the State’s issues, but in a
cross-appeal, Little Elm raises four issues of its own, arguing that we should
reverse the trial court’s judgment and render a judgment awarding damages of
$4,075,000.[2]  We reverse and remand
for a new trial.

Background
Facts

          Before
2009, Little Elm owned a 3.811-acre tract of land in the Town of Little Elm
(the Town).  One side of Little Elm’s predominantly triangular property bordered
FM 720, by which cars entered the property.  The side of Little Elm’s property
that bordered FM 720 was approximately 830 feet long.  Most of the property was
zoned for light commercial use.  Another part of the property, in the northeast
corner, was zoned for single-family residential use.  The residential part had not
been developed, and it contained a curb opening by which cars accessed the
commercial part.

          In
2009, the property contained four buildings (each of which was constructed well
before 2009):  an over-28,000-square-foot retail building that contained, among
other businesses, a grocery store and a liquor store; a 9,000-square-foot retail
building that contained a Subway restaurant and a beauty supply store; a 2,286-square-foot
medical/office building; and a 2,499-square-foot building containing self-storage
units.  The property also had approximately 140 parking spaces.  To operate,
each of the businesses on Little Elm’s property had to obtain a certificate of
occupancy from the Town.

          Little
Elm’s property contained features that did not conform to the Town’s zoning
ordinances, such as an inadequate number of parking spaces, insufficient
building setbacks, noncompliant architecture, and insufficient landscaping.  But
because these features existed before the property was within the Town’s
jurisdiction and before the Town’s zoning ordinances were effective, the
features were classified as legal nonconformities, meaning that they were
grandfathered.[3]

          Stacy
Standridge is Little Elm’s general partner and its sole decision maker.  When
Little Elm purchased the property in 2004 for just under $4 million, Standridge
knew of the State’s plans to expand FM 720.  In September 2008, John Taylor,
the Town’s director of planning and development, sent a letter to some of the
property owners along FM 720, including Little Elm (through Standridge).  The
letter stated in part,

          It is our understanding that you are the owner
of the above[-] referenced property from which the Texas Department of
Transportation (“TxDOT”) is seeking to acquire property for the expansion and
improvement of [FM 720] within the Town of Little Elm . . . .

          After consultation with our Town Attorney, and
after review of the Town’s zoning provisions regarding alterations and
enlargements of nonconforming structures or uses (sometimes called “Grandfathered
Rights”), it is the Town’s position that the removal of certain improvements
from your property and/or the reduction in the size of your property as a
result of TxDOT’s acquisition will cause the current nonconforming structure on
your property to lose its nonconforming or “Grandfathered” status.  As a
result, you will be required to bring your property up to all current Town
codes and ordinances in order to continue to operate a business on your property.

          The Town Council is aware of this situation and,
on September 2, 2008, it adopted a formal policy statement that requires all
property owners of property that will be in violation of Town codes and ordinances
as a result of TxDOT’s . . . acquisitions to (1) take all
required steps to bring their properties into full compliance with all Town
codes and ordinances or (2) demolish the unlawful structures within 60 days of
the structure becoming illegal.  The Town Council has instructed Town staff to
make every effort to accommodate property owners and to work with them to see
if solutions can be crafted to address the loss of nonconforming use rights
caused by TxDOT’s acquisition of land . . . .

          This letter is sent to you as part of the
Town’s accommodation efforts to ensure that you are fully aware of the Town’s
position regarding the loss of you ability to lawfully maintain and operate a
business on your property once TxDOT has physically altered your land.

          About
a month after Taylor sent the letter quoted above, the Town passed Ordinance
918.  The ordinance stated in part,

          WHEREAS, the Town Council desires to establish
standards and regulations for when right-of-way is acquired by a governmental
agency, and has determined that the amendments set forth herein should be
adopted . . . .

                   .
. . .

Sec. 22-147.  Regulations and Exemptions.

          a)  In the event a Right-of-Way Acquisition[[4]]
by a Governmental Agency causes a property or its improvements to be in
violation of Town zoning ordinances, subdivision rules, or other town
ordinances said property shall be exempt from said provisions to the extent
said violation is caused by the Right-of-Way Acquisition, subject to the
following:

                   . . . .

                    3)  Compensation provided; exemption
inapplicable.

          (a)  If a Governmental Agency offers
compensation to a property owner for the demolition of improvements or for
other Curative Measures which renders the property or its improvements to be in
violation of Town zoning ordinances, then the property shall not be eligible
for exemptions under this section.

          (b)  The Planning Director is authorized to
provide notice to any affected property owner, lien holder, and/or certificate
of occupancy holder, listing the items of noncompliance for which no exemption
is being provided under this section.

                             . . . .

          4)  The Building Official is authorized to
revoke a Certificate of Occupancy of any building or structure for which
compensation has been offered to be paid for the building or structure to be
demolished as part of a Right-of-way Acquisition by a Governmental Agency and
the property has been physically impacted by the roadway project construction.

                    . . . .

          6)  A Certificate of Occupancy shall not be
issued for any building or structure for which compensation has been paid for
the building or structure to be demolished or for other Curative Measures until
such time that the property and its improvements either come into full
compliance with all applicable ordinances of the Town . . . or
the Curative Measures, for which the compensation was paid, have been
completed.

          In
conjunction with passing Ordinance 918, the Town created an agenda information
sheet.  Under the heading of “PLANNING ANALYSIS,” the agenda information sheet
stated in part,

          On September 2, 2008, the Council adopted the
following policy relating to properties impacted by [a] right-of-way
acquisition:

          All property owners of property that will be in
violation of Town codes and ordinances as a result of TxDOT’s [FM 720]
acquisitions are required to (1) take all required steps to bring their
properties into full compliance with all Town codes and ordinances or (2) demolish
the unlawful structures within 60 days of the structure becoming illegal.  The
Town Council has instructed Town staff to make every effort to accommodate
property owners and to work with them to see if solutions can be crafted to
address the loss of nonconforming use rights caused by TxDOT’s acquisition of
land . . . .

          [Ordinance 918] clarifies how these properties
will be addressed . . . .  The ordinance exempts a property from an ordinance requirement
if a property becomes in violation due to [a right-of-way] taking and there are
no payments made to the property owner for damages to the remainder . . . .

          However, if the property owner is paid any
damages to the remainder then all ordinances must be met before the
property can continue to be used.

          In
January 2009, the State filed a petition to condemn, through eminent domain, a
12,504-square-foot (.287-acre) portion of Little Elm’s property that abutted FM
720.[5] 
In the petition, the State contended that it needed the property to expand the
roadway and that the State and Little Elm had been unable to agree upon the
damages caused by the acquisition.

          The
trial court appointed a panel of three special commissioners to assess Little
Elm’s damages.[6]  Following a hearing, the
special commissioners awarded $222,757 to Little Elm.  Little Elm objected to
the award and demanded a jury trial on the State’s petition.[7] 
On April 22, 2009, the State deposited the amount of the special commissioners’
award into the registry of the court, which gave the State the ability to take
possession of the property.[8]  The parties agree,
therefore, that April 22, 2009 became the official date of the State’s
condemnation of Little Elm’s property.[9]

          In
May 2009, the Town passed Ordinance 954, which stated in part,

Waiver or Variance.

          a.  . . .  [A]ny
property owner that receives compensation from a governmental agency in an
eminent domain action for the demolition of improvements, or for other curative
measures which render the property or its improvements to be in violation of
Town zoning and development ordinances, may request a waiver or variance from
the applicable Town ordinances if the property owner contends that the amount
of compensation received is inadequate to pay for all of the real or personal
property improvements, modifications, alterations[,] and other requirements
imposed by the Town as a result of the loss of property occasioned by the
eminent domain action.

          b.  . . .  The
Town Council may grant a waiver or variance from any Town standard or
requirement . . .  if the Town Council finds that the imposition of a
particular Town standard or requirement upon a property owner will result in an
undue hardship to a property owner that has not received compensation adequate
to pay for all of the real or personal property improvements, modifications,
alterations[,] and other requirements imposed by the Town as a result of the
loss of property occasioned by the eminent domain action.

          Little
Elm hired Robert Baldwin, a land planner, to examine the effects of the
condemnation.  According to Baldwin, the State’s condemnation, which affected
parts of the commercial and residential sections of the property, required the
elimination of approximately forty of Little Elm’s original parking spaces. 
Thus, Little Elm’s property became more nonconforming to the Town’s ordinances
regarding parking than it was before the condemnation.

          Baldwin
reviewed and considered Taylor’s September 2008 letter and Ordinance 918, and
he concluded, in an opinion expressed in a pretrial deposition and later at
trial, that as a result of those documents, the features on Little Elm’s
property that did not comply with the Town’s zoning ordinances would lose their
legally nonconforming status, Little Elm would not be able to bring its
property into compliance, and Little Elm would therefore be required to
demolish all of the buildings on its property.  In his land planning with
respect to Little Elm’s property, Baldwin spoke to some of the Town’s officials,
including Taylor and Senior Planner Dusty McAfee, who is subordinate to Taylor.

          Little
Elm designated Baldwin and Robert Hawkins, a real estate appraiser, as
experts.  Hawkins testified in his deposition that McAfee had told him that the
Town “didn’t care much” for Little Elm’s property and “that for some time the
[Town] had been trying to do something about the property.”  Hawkins also said
that Taylor had told him that the Town had the authority under Ordinance 918,
upon a taking, to require a property owner to bring all previous legal
nonconformities into compliance with the Town’s regulations.  Before the
deposition, Hawkins had based his written appraisal on what he said that Taylor
had told him and on the “Extraordinary Assumption that . . . the
Town [would] require property owners to cure any and all code non-conformance[s] . . . ,
even to the extent of curing items previously considered legal, but
non-conforming.”

          According
to Hawkins, Taylor was the “deciding party in [Ordinance] 918.”  Hawkins said in
the deposition that Taylor had expressed that he “intended fully to force the
property owner to bring the entire property and all nonconformities into
compliance.”  Hawkins acknowledged that his understanding of Ordinance 918 was
that if the State condemned one parking spot on a property and compensated the
owner for that spot, the owner would have to cure all existing nonconformities
on the property regardless of whether they were related to parking.  Hawkins
believed that it would be cheaper to demolish the buildings on Little Elm’s
property than to bring them into compliance with the Town’s regulations.  In
the deposition, Hawkins discounted the effect of Ordinance 954 on Little Elm’s
alleged duty to cure all nonconformities because Ordinance 954 was not in
effect on the date of the State’s condemnation and because that ordinance did
not guarantee that a property owner could obtain a variance.

          The
State filed pretrial motions to exclude the proposed expert opinions from
Baldwin and Hawkins.  The State contended that these experts had incorrectly
opined, without sufficient factual support and in contravention to Ordinance
918, Ordinance 954, and Taylor’s deposition testimony, that as a result of the
condemnation, Little Elm would be required to cure all nonconformities on the
property, therefore requiring complete demolition of the property’s
improvements.  The State contended that the experts’ opinions in that regard
were neither relevant (because the opinions were not sufficiently tied to the
facts of the case) nor reliable (because they were speculative) and that the
opinions should therefore be excluded under rule of evidence 702.[10]

          Before
the trial began, on August 13, 2010, Baldwin wrote a memorandum to Taylor in
which Baldwin expressed his understanding that Little Elm’s property was
“currently a legal nonconforming [property] and [Little Elm would] be allowed
to reconfigure the site, provided that [Little Elm did] not make the site more
nonconforming.”  In September 2010, the Town approved a conceptual site plan
that Baldwin had prepared.  Although Baldwin had stated in his deposition that
Little Elm would need to demolish all of the buildings on its property and
planned to testify to that opinion at trial, the approved conceptual site plan indicated
otherwise; the plan allowed for three of the four buildings to remain on Little
Elm’s property.  In fact, an “Agenda Information Sheet” that was prepared in
the process of the approval of the conceptual site plan contradicted Baldwin’s
opinion by stating in part that none of the elements of Little Elm’s property
that were nonconforming on the date of the taking would “have to be corrected
unless the property [was] 100% damaged by TXDOT,” which was “not anticipated.” 
The Agenda Information Sheet relating to the approved conceptual site plan
described the effect of Ordinance 918 as “establishing a legal framework for
the Town to follow as it relates to properties being made non-conforming or
more non-conforming due to a TXDOT taking.”  The Agenda Information Sheet also
stated that under Ordinance 918, “if the property owner is paid any damages
to the remainder then the elements of the property which are made
non-conforming or more non-conforming must be brought up to code before the
property can continue to be used.”

          Little
Elm sought to exclude evidence of the Town’s approval of Baldwin’s conceptual
site plan on the ground that the submission of the plan occurred during
settlement negotiations between Little Elm and the State.  The State filed a
pretrial document arguing that the approved site plan was admissible “as
rebuttal evidence of Baldwin’s inaccurate report” and also under the rule of
optional completeness.

          In
the middle of September 2010, weeks before the trial began, the trial court
held a hearing on some of the parties’ pending motions.  The court denied the
State’s motion for a late designation of Taylor as an expert witness (in part
based on the trial court’s conclusion that Taylor would not be allowed to opine
on the meaning of the City’s ordinances), but the trial court recognized that
either party could call Taylor as a fact witness.  Because of rulings from another
pretrial hearing and objections raised during the trial, the trial court (1)
denied Little Elm’s motion, predicated on the State’s alleged discovery abuse, to
totally strike testimony from the State’s appraisal expert, Daniel Wright; (2)
excluded evidence of Wright’s “Scenario 2” appraisal (in which he would have
testified that Little Elm sustained less than $500,000 in total damages because
Little Elm could have rezoned the residential part of its property to use that
part to cure the loss of its parking spaces); (3) permitted testimony from
Baldwin about his opinion that the buildings on Little Elm’s property required demolition
because of Taylor’s letter and Ordinance 918; and (4) excluded evidence of
matters that occurred after the date of the condemnation that may have reflected
the Town’s intent with respect to Little Elm’s property, including the Town’s
approval of Baldwin’s conceptual site plan and evidence concerning the language
of Ordinance 954 (although the court allowed evidence that as of the date of
condemnation, it was reasonably foreseeable that some ordinance that granted
relief from Ordinance 918 could be passed).

          During
the State’s cross-examination of Baldwin at trial, he acknowledged that in his
experience as a land planner, he had never seen an ordinance that required
total demolition of buildings because of the condemnation of a fifteen-foot
strip of land that did not directly affect the buildings.  He also conceded
that he had not analyzed whether some of the buildings on Little Elm’s property
could be demolished to save the other buildings.  Next, Baldwin admitted that
Taylor had told him that Ordinance 918 did not apply “unless 100 percent of the
improvements were damaged out by TxDOT,” but Baldwin stated that he nonetheless
construed Ordinance 918 differently than how Taylor had construed it.  Baldwin
agreed that Taylor’s letter could not have bound the Town about its plans for
Little Elm’s property, and Baldwin testified that between Taylor’s letter and
Ordinance 918, “[t]he ordinance would govern.”  Baldwin also conceded that at
the time of the trial, the Town had not, as a result of Ordinance 918, revoked
any certificate of occupancy or required demolition of any building.  Rather, Baldwin
testified that the businesses at Little Elm’s property had continued to operate
in the eighteen months since the April 2009 condemnation.  As to possibly using
Little Elm’s residential property to cure some of the overall deficiencies on
Little Elm’s property, Baldwin stated that the residential property “ha[d] the
wrong zoning on it.”

          During
Hawkins’s testimony at trial, he agreed with Baldwin that Taylor’s letter and Ordinance
918 caused Little Elm’s buildings to lose their legally nonconforming status
and that because the buildings had no economic value as illegal, they would
require demolition.  Hawkins also testified that the letter and ordinance
affected the perception of risk in the marketplace.  He explained,

[T]here was no way to cure the nonconformities.  And any
prospective purchaser looking at the property would have to be shown, under the
property condition report, this ordinance and the letter.  And as a result,
they wouldn’t attribute any value to the existing improvements.  So then you’re
left with a vacant piece of land [that] you are effectively buying.

Hawkins
concluded that the remainder of Little Elm’s property (the part not condemned
by the State) had received approximately $4 million in damages attributable to
the condemnation because, in part, “no buyer in his right mind would attribute
value to the improvements,” and Little Elm had therefore lost that value.[11] 
Hawkins stated that Taylor had told him that “all of the nonconformities on the
property would have to be cured.”

          On
cross-examination, Hawkins stated that when he submitted his report, he did not
know that part of the area of the State’s condemnation involved the residential
part of Little Elm’s property.  He agreed that he had presumed that Little
Elm’s residential property was bought for “parking expansion,” but he stated
that through his conversations with the Town’s officials, he understood that
the property would not be rezoned.  Hawkins also admitted that when he discussed
his interpretation of Ordinance 918 in his report, he assumed that sections of
that ordinance that required an offer of compensation from the State to trigger
a landowner’s obligations would apply although he did not know at the time of
the report about whether the State had offered compensation to Little Elm.  Hawkins
conceded that a prospective buyer of Little Elm’s property would likely
approach the Town to determine precisely what the Town would allow with respect
to the buildings on the property.

          During
the State’s direct examination of Wright, he opined that Ordinance 918’s plain
language did not divest Little Elm’s property of its grandfathered status or require
Little Elm to cure all of its nonconformities.  He also stated that, as
explained in his “Scenario 1” written appraisal (the only appraisal on which
the trial court allowed him to testify at trial), all of the parking spaces
lost through the condemnation could be recovered through demolishing about
one-third (10,954 square feet) of the largest of the four buildings.  Wright
testified that the remainder damages to Little Elm’s property from the State’s
condemnation, including the proposed cost of demolishing part of one of Little
Elm’s buildings to restore parking (as valued by an independent company) and
the loss of value as a result of the diminished size and income-generating
potential of that building, equaled $1,134,171.  Wright also stated that based
on “market evidence” that he had evaluated, it was reasonably foreseeable that
Little Elm’s residential property could be rezoned as commercial property.

          At
trial, Little Elm objected to any testimony from Taylor on the grounds that he
was not identified as a trial witness by the State and was not qualified to
interpret Ordinance 918 or to state how the ordinance might be applied, but the
trial court allowed him to testify.  Taylor stated that Ordinance 918
superseded the letter that he had sent out to select property owners regarding
the effects of condemnation.  Taylor also expressed that the plain language of
Ordinance 918 did not state that property owners would lose any grandfathered,
legal nonconformities.  Taylor denied that he ever told Baldwin or Hawkins that
all of Little Elm’s buildings would require demolition or that all of the
buildings’ nonconformities would need to be brought into compliance with the
Town’s zoning ordinances.  Taylor conceded on cross-examination, however, that
in March 2010, he wrote an e-mail indicating that the nonconformities on Little
Elm’s property that would need curing were dependent on “the amount of damages
that [were] paid by TXDOT and what those damages [were] paid for.”

          The
jury returned a verdict awarding Little Elm $95,000 for the 12,504 square feet of
Little Elm’s property that the State condemned (a value that Hawkins had
assigned)[12] and $2,232,913 for the
reduction in market value to the remainder of Little Elm’s property.  The trial
court signed a judgment that incorporated the jury’s verdict.  The State filed
a motion for new trial, and after the trial court denied that motion, the State
brought this appeal.  Little Elm also appealed.

Evidentiary
Complaints

          In
its first issue, the State contends that the trial court improperly admitted Baldwin’s
and Hawkins’s expert testimony that because of Taylor’s letter and Ordinance
918, the State’s condemnation required the demolition of Little Elm’s buildings. 
In its second issue, the State argues that the trial court erred by excluding
testimony from the State’s experts about Scenario 2, the land plan that would
have allowed for recovery of the parking spaces that were lost through
condemnation by placing the spaces on Little Elm’s residential property.  In its
third issue, the State asserts that the trial court erred by excluding evidence
concerning Ordinance 954 and the Town’s approval of Baldwin’s conceptual site
plan.  In its fourth cross-issue, Little Elm argues that the trial court erred
by denying a challenge to the State’s expert testimony.

Standard
of review and applicable law

          We
review a trial court’s admission or exclusion of evidence under an abuse of
discretion standard.  See State v. Cent. Expressway Sign Assocs., 302
S.W.3d 866, 870 (Tex. 2009) (op. on reh’g); Shelton v. Sargent, 144
S.W.3d 113, 123 (Tex. App.—Fort Worth 2004, pets. denied).  “To determine
whether a trial court abused its discretion, we must decide whether the trial
court acted without reference to any guiding rules or principles—in other
words, whether the act was arbitrary or unreasonable.”  Shelton, 144
S.W.3d at 123.  Merely because a trial court may decide a matter within its
discretion in a different manner than an appellate court would in a similar
circumstance does not demonstrate that an abuse of discretion has occurred.  Id.

          The
United States and Texas constitutions require governments to compensate
landowners for taking their property for a public use.  U.S. Const. amend. V
(requiring just compensation when the government takes private property for
public use); Tex. Const. art. I, § 17(a).  When only part of a landowner’s
property is taken, adequate compensation is required both for the part taken
and for any damages to the remainder.  State v. Schmidt, 867 S.W.2d 769,
772 (Tex. 1993), cert. denied, 512 U.S. 1236 (1994); Coble, 134 S.W.3d
at 454.  The proper measure of compensation damages when only a portion of a
tract is taken for public use is the market value of the part taken and the
difference between the market value of the remainder property immediately
before the condemnation and the market value of the remainder property
immediately after the condemnation, taking into consideration the nature of any
improvements and the use of the land taken.  Coble, 134 S.W.3d at 454.

          Courts
should admit as market-value evidence such matters as suitability,
adaptability, surroundings, conditions before and after, and all circumstances
which tend to increase or diminish the remainder’s market value.  Id.  A condemnee
“may recover damages which are reasonably foreseeable, and [the condemnee] may
show the reasonably probable uses of the tract taken that are calculated to
depress the value of the remainder tract and thus enhance the recovery of
damages.”  City of Pearland v. Alexander, 483 S.W.2d 244, 247 (Tex. 1972). 
Damages due to required modifications to the remainder, as a result of the
condemnation, or damages due to a loss of improvements on the remainder because
of the condemnation may, on a proper showing, be compensable.  State v.
Centennial Mortg. Corp., 867 S.W.2d 783, 784 (Tex. 1993) (holding that evidence
of costs of modifications to a condemnee’s remainder property that were required
as a result of the condemnation was admissible to show a decrease in market
value), cert. denied, 513 U.S. 812 (1994).  But evidence should be
excluded “relating to remote, speculative, and conjectural uses, as well as
injuries, which are not reflected in the present market value of the property.”
 Schmidt, 867 S.W.2d at 773; Tex. Elec. Serv. Co. v. Campbell,
161 Tex. 77, 81, 336 S.W.2d 742, 745 (1960); Coble, 134 S.W.3d at 455.

The
admission of Baldwin’s and Hawkins’s testimony

          The
State contends that the opinions from Baldwin and Hawkins that Little Elm would
be required to cure all nonconformities on its property, thus requiring the demolition
of its buildings, were inadmissible because they were irrelevant and
unreliable.  Before trial, through written motions and a pretrial hearing, the
State sought exclusion of such opinions.

          As
explained by our supreme court, for an expert’s testimony to be admissible
under rule of evidence 702,

the expert must be qualified, and the expert’s opinion
must be relevant to the issues in the case and based upon a reliable
foundation. . . .

          The relevance requirement, which incorporates
traditional relevancy analysis under Texas Rules of Evidence 401 and 402, is
met if the expert testimony is “‘sufficiently tied to the facts of the case
that it will aid the jury in resolving a factual dispute.’”  Evidence that has
no relationship to any issue in the case does not satisfy rule 702 and is thus
inadmissible under rule 702, as well as rules 401 and 402.

          In contrast, Rule 702’s reliability requirement
focuses on the principles, research, and methodology underlying an expert’s
conclusions.  Under this requirement, expert testimony is unreliable if it is . . . no
more than “‘subjective belief or unsupported speculation.’”  Expert testimony
is also unreliable if there is too great an analytical gap between the data the
expert relies upon and the opinion offered.  In applying this reliability
standard, however, the trial court does not decide whether the expert’s
conclusions are correct; rather, the trial court determines whether the
analysis used to reach those conclusions is reliable.

Exxon
Pipeline Co. v. Zwahr, 88 S.W.3d 623, 628–29 (Tex. 2002)
(citations omitted); see Cent. Expressway Sign Assocs., 302 S.W.3d at
870 (“To be relevant, the expert’s opinion must be based on the facts; to be
reliable, the opinion must be based on sound reasoning and methodology.”); Guadalupe-Blanco
River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002) (explaining that the
relevancy and reliability requirements under rule 702 apply to “the testimony
of expert appraisal witnesses in condemnation actions”).

          In
Coble, the City of Mansfield had condemned part of Coble’s land to build
streets.  134 S.W.3d at 451.  Before the condemnation occurred, the City had
adopted an ordinance requiring screening walls to be erected when a residential
subdivision abutted a thoroughfare.  Id. at 452.  Coble proffered expert
testimony that if he developed his land, which carried single-family
residential zoning, into a residential subdivision, the costs of complying with
the ordinance would be $186,980, and Coble contended that those costs should therefore
have been compensable in the condemnation action.  Id. at 452, 455.  We
held such testimony to be inadmissible, explaining that the testimony was
remote, speculative, and conjectural because, in part, Coble’s tract had not
been platted for residential subdivision development, Coble had applied to
change the zoning on his land to commercial, and Coble was “seeking to recover
the estimated cost of complying with an ordinance, the applicability of which
had not yet been determined at the time of taking.”  Id. at 455–56.  We explained
that Coble’s proffered expert testimony was

based upon the speculative assumption that residential
subdivision development of the remainder tract will occur, and that the
property will be platted so that the layout of lots will trigger the
necessity to incur the costs to comply, bypassing all of the problems as well
as the steps that might occur with possible residential development of the
tract.

Id. at
457.  We also noted that Coble had offered “no evidence that he would be unable
to get a variance or a modification of the screening wall requirement from the
Mansfield Planning and Zoning Commission.”  Id.  We further discussed
how Coble was effectively “seeking to recover the potential future costs of
complying with the ordinance as damages for inverse condemnation by a
regulatory taking, when the applicability of [the ordinance] had not been
determined at the time of the eminent domain proceeding.”  Id. at 458. 
We explained that such an inverse condemnation claim would not be ripe because
“no regulatory taking occurs until the governmental entity charged with
implementing the regulation reaches a final decision regarding application of
the regulation to the property.”  Id.; see City of El Paso v. Madero
Dev., 803 S.W.2d 396, 400 (Tex. App.—El Paso 1991, writ denied), cert.
denied, 502 U.S. 1073 (1992).

          Earlier
this year, we discussed and distinguished Coble in a case with variant
facts.  See State v. Ledrec, Inc., 366 S.W.3d 305, 311 (Tex. App.—Fort
Worth 2012, no pet.).  Ledrec, Inc. (Ledrec) owned property in the
extraterritorial jurisdiction of the City of Mansfield, and to widen a road,
the State condemned part of the property.  Id. at 307.  Ledrec’s expert
opined that the remainder damage from the condemnation was $248,000, reasoning that

because the front two buildings would be only twenty feet
from the road after the taking, the property would not be compliant with most
of the zoning classifications Mansfield would likely impose on the property,
all of which require minimum setback lines of thirty feet from the road.  Although
this thirty-foot setback would not apply to the property while it was only in
the [extraterritorial jurisdiction] (unless Ledrec were to replat the
property), once Mansfield annexed the property, the front two buildings would be
nonconforming under Mansfield’s zoning ordinance.

Id. 
The State contended that the opinion from Ledrec’s expert was inadmissible
because it was “based on the mere possibility that the buildings [would] become
functionally obsolete and no longer generate income as of the day of the taking
even though Mansfield ha[d] not yet annexed the property and there [was] no
evidence as to when Mansfield [would] annex it.”  Id.  We framed the
question presented by these facts as whether “an expert can testify to a damage
amount that is based on the expert’s opinion that remainder property loses some
or all of its income producing potential, and thus market value, as of the date
of taking due to the mere potential of future annexation.”  Id. at 310–11. 
After discussing Coble, we held that the testimony from Ledrec’s expert
was admissible, reasoning,

[The expert’s] testimony here is that, based on his over
twenty years of experience as an appraiser, a willing buyer would presume that
the front two buildings would not generate any income as of the date of taking
(regardless of whether they were at that time actually producing
income)—because of the possibility that an annexation would force a change in
use of the buildings—and would therefore assign no value to those buildings in
a purchase.  Thus, [the expert’s] testimony is not based on a speculative or remote
possibility—the property’s market value at the time of a future annexation—but
rather, it is based on an assessment of the current value a willing buyer and
seller would place on the remainder property as of the date of taking because
of the perception that annexation could limit the property’s use.  Whether this
opinion is correct is not for this court to resolve; whether it is based on a
proper measure of damages is.

Id. at
311 (footnotes omitted) (citation omitted).  In a footnote, we described the
difference between the opinion offered by Ledrec’s expert and the opinion at
issue in Coble as “subtle” because

although [the expert’s] report . . . state[d]
that the taking would actually render the front two buildings functionally
obsolete and unleasable as of the date of taking—as opposed to stating that a
willing buyer and seller would presume that the buildings would become
functionally obsolete and unleasable as of the date of taking—his deposition
testimony, construed in Ledrec’s favor, [was] that he considered both a buyer’s
and seller’s positions in making his determination of market value.

Id. at
311 n.6.

          Considering
our decisions in Coble and Ledrec, Inc. together, the distinction
of admissibility that we have applied is that an expert may testify about how
an uncertainty with regard to a governmental action may have affected the
market value (in other words, how potential buyers and sellers would weigh the
risks related to the property) on the date of the taking, but an expert may not
opine about how that uncertainty will actually be resolved in a date after the
taking when that opinion is speculative or conjectural.  See Ledrec, Inc.,
366 S.W.3d at 311 & n.6; Coble, 134 S.W.3d at 455–58; see also Heddin
v. Delhi Gas Pipeline Co., 522 S.W.2d 886, 888 (Tex. 1975)
(explaining that fear in the minds of the buying public may be considered in a
condemnation case when there is a basis in reason for the fear, the fear enters
into the calculations of persons who deal in the buying and selling of similar
property, and the market experiences depreciation because of the fear); Melton
v. State, 395 S.W.2d 426, 429 (Tex. Civ. App.—Tyler 1965, writ ref’d
n.r.e.) (explaining that “market value . . . should be based
upon a reasonable cash value and a reasonable use for reasonable adaptability,
and not upon some speculative, contemplated, use to be made of the land”).[13] 
The speculative and conjectural nature of the latter type of testimony in
condemnation cases that have facts similar to those in this case may be
understood by considering the law related to inverse condemnation cases, which similarly
to the damage theory presented by Little Elm, concern how the government’s actions
may affect the value and use of property.  See City of Houston v. Maguire
Oil Co., 342 S.W.3d 726, 735 (Tex. App.—Houston [14th Dist.] 2011, pet.
denied).  Those cases generally become jurisdictionally ripe (as not having an
injury that is too remote to be adjudicated) only after the government reaches
a final decision about how a regulation applies to property and after a
plaintiff has been denied a variance from the government.  See Mayhew v.
Town of Sunnyvale, 964 S.W.2d 922, 929 (Tex. 1998), cert. denied,
526 U.S. 1144 (1999); Coble, 134 S.W.3d at 458.

          Applying
the principles illustrated by Coble and Ledrec, Inc. to this
case, we believe that Baldwin’s testimony went too far.  In both the pretrial hearing
on the State’s motion to exclude his testimony and in his testimony before the
jury at trial, Baldwin stated that the Town would force Little Elm to comply
with all of its codes and that, since Little Elm could not do so, Little Elm
would need to demolish its buildings.  When Baldwin was asked during the
pretrial hearing about his “final analysis of the remainder property,” he
stated,

Well, after reading the letter, the ordinance, and the
City’s policy statement that was part of the ordinance adoption, it seemed to
me that the property owner was going to be compelled to bring the property into
full compliance with all the City ordinances.  That’s what it says.  And I can’t
see how you’re going to be able to bring buildings that have setback issues,
side and rear setback issues, buildings that don’t meet the architectural
standards, meaning they have to be articulated both vertically and
horizontally, I don’t see how you can bring them into full compliance . . . .  And
so I think that the building is going to have to be torn down to meet the
requirements of Ordinance 918.  [Emphasis added.]

In
front of the jury, Baldwin testified that Little Elm could not achieve full
compliance with the Town’s zoning ordinances after the State’s condemnation and
that Little Elm would be required to demolish all of its buildings.

          Under
the facts of this case, Baldwin’s opinion that Little Elm’s buildings would
require demolition was impermissibly speculative because, among other possible
reasons, (1) although Taylor’s letter stated that Little Elm would be
required to “bring [its] property up to all current Town codes and ordinances,”[14]
it also stated that the Town intended to “make every effort to accommodate
property owners and to work with them to see if solutions [could] be crafted to
address the loss of nonconforming use rights” and advised each property owner
to “set up an appointment . . . to review [the owner’s]
particular situation”; (2) even if Ordinance 918 authorized the Town to
require the demolition of Little Elm’s buildings (a fact that was in dispute
based on the various witnesses’ understandings of that ordinance at trial),[15]
the Town had not actually sought to apply Ordinance 918, and certainly had not
made a final decision to apply Ordinance 918, to Little Elm’s buildings or any
other buildings in that manner at the time of the condemnation (or at the time
of the trial); (3) Baldwin conceded that Taylor told him that the Town
would not require Little Elm’s property “to come into full compliance,” but
Baldwin said that he “disregarded” Taylor’s statement; and (4) the
evidence from Little Elm’s witnesses at the pretrial hearing established that
on the date of the condemnation, it was “reasonably foreseeable” that the Town
would pass another ordinance by which property owners could seek variances from
the Town’s requirements with respect to Ordinance 918, and Little Elm did not
present evidence that it could not seek or would not be able to obtain such a
variance.  Thus, because Baldwin’s opinion about the allegedly required demolition
of Little Elm’s buildings was speculative and conjectural, we hold that the
trial court abused its discretion by admitting this testimony.  See Zwahr,
88 S.W.3d at 629; Schmidt, 867 S.W.2d at 773; Coble, 134 S.W.3d at
454–58.

          There
is a sound reason why such speculative testimony should be inadmissible.  To
the extent that a jury bases its remainder damages decision on a speculative,
future injury to be incurred by the landowner and the injury does not
eventually occur, the landowner will have received a windfall, which contravenes
the purpose of awarding just compensation in condemnation proceedings.  See
Zwahr, 88 S.W.3d at 628 (“[T]he objective of the judicial process in the
condemnation context is to make the landowner whole.”); see also  United
States v. Twin City Power Co., 350 U.S. 222, 228, 76 S. Ct. 259, 262 (1956)
(explaining that a landowner is to receive “no more than indemnity for his
loss”).

          For
an error in the trial court to result in reversal of the trial court’s judgment,
the record must establish that the error probably caused rendition of an
improper judgment or probably prevented the appellant from properly presenting
the case to this court.  Tex. R. App. P. 44.1(a); Romero v. KPH Consolidation,
Inc., 166 S.W.3d 212, 225 (Tex. 2005).  If erroneously admitted or excluded
evidence was crucial to a key issue, the error was likely harmful.  Cent.
Expressway Sign Assocs., 302 S.W.3d at 870.  We examine the entire record
in making this determination of harm.  Interstate Northborough P’ship v.
State, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh’g).  We evaluate the
entire case from voir dire to closing argument, considering the evidence,
strengths and weaknesses of the case, and the verdict.  Serv. Corp. Int’l v.
Guerra, 348 S.W.3d 221, 236 (Tex. 2011).  We also consider whether counsel
emphasized the erroneous evidence.  Id.

          From
voir dire through its final jury argument, Little Elm emphasized its position
that the Town would actually require demolition of Little Elm’s buildings.  For
example, in voir dire, Little Elm’s counsel told the jury,

[T]he evidence that we will present to the jury will show
that the experts that we will bring before the jury have determined, based upon
the [Town’s] zoning ordinance, that this piece of property after the taking
doesn’t comply with the zoning ordinance and cannot be used after the taking as
it was used before.

          . . . .

          . . .  Let me just tell you what the
landowner’s information is going to be and the evidence is going to be, that
this property can no longer be used, period.

During
Little Elm’s opening statement, its counsel stated in part, “[T]his case
involves a taking by the State, which triggers a response from the City, which
causes the damages that we’re going to be talking about with you during the
next couple of days.”  During Little Elm’s final jury argument, its counsel
said,

[T]he land planning expert, Rob Baldwin, told you that
full compliance means that these improvements will be demolished. There’s no
other way. There’s no way to correct or cure the nonconformities.  You can’t
move the buildings.  You can’t pick them up and relocate them to get them out
of the way. . . .  So are the nonconformities going to continue
to exist after the taking?  According to the Town of Little Elm, they are not.  [Emphasis
added.]

           Baldwin’s
testimony, coupled with these statements by Little Elm’s counsel, encouraged
the jury to consider the speculative question of what would actually occur with
Little Elm’s property after condemnation rather than properly focusing on how
uncertainties might have affected the property’s market value at the time of
the condemnation.  See Schmidt, 867 S.W.2d at 773.  We conclude that
there is a reasonable probability that inadmissible evidence that characterized
the demolition of Little Elm’s buildings as a certainty, rather than a
market-affecting factor, improperly influenced the jury’s verdict on remainder
damages.  That verdict, $2,232,913, was not based on the values for remainder
damages given by either appraiser, Wright or Hawkins, so it seems likely to us
that the jury weighed other considerations.  Although part of Hawkins’s
testimony was the type of testimony that we have held to be generally admissible
because that part focused on how the market was affected by a perception or
fear that Little Elm would have to demolish its buildings,[16]
the jury apparently based its verdict, at least in part, on a factor other than
(or in addition to) Hawkins’s market-based testimony because the jury awarded
substantially less remainder damages than the value that Hawkins suggested.  We
hold that the trial court’s erroneous admission of Baldwin’s speculative
testimony probably caused the rendition of an improper judgment.  See Tex.
R. App. P. 44.1(a)(1).  We sustain the State’s first issue to the extent of
holding that the trial court abused its discretion by admitting the part of
Baldwin’s testimony described above.

The exclusion
of the State’s evidence concerning remainder damages

           In
its second issue, the State asserts that the trial court erred by excluding
part of the evidence that the State sought to offer on remainder damages.[17] 
Specifically, the State contends that the trial court erred by excluding evidence
relating to Wright’s Scenario 2 appraisal, which proposed using the residential
part of Little Elm’s property to cure the parking spaces that were lost through
the condemnation, and by excluding testimony from Duane Hutson, the State’s
expert who developed the land plan leading to that proposal.

           Scenario
1 of Wright’s report, upon which Wright based his testimony at trial,
calculated remainder damages based on an assumption that the part of Little
Elm’s property that was zoned residential on the date of the taking could not
be used for parking spaces.  Scenario 2 calculated remainder damages based on
an assumption that the residential portion could be rezoned and could be used to
replace the parking lost through the condemnation.  During a pretrial hearing,
Little Elm argued that evidence concerning Scenario 2 should be excluded
because, in part, Scenario 2 assumed “that the site, which is owned by the
partnership of Little Elm Properties, would be taken without cost, without
remuneration, and used as a parking lot at zero.”  Little Elm contended that
the use of the residential portion of its property could not offset the
remainder damages that it had incurred with respect to its commercial property.

          During
the pretrial hearing, Wright testified that Little Elm bought the property at
issue in 2004.  Wright explained that the far northeastern part of the
property, comprising about 11,200 square feet, was residentially zoned, while
the rest of the property was zoned for light commercial use.  Wright testified
that he had considered “market evidence” demonstrating a reasonable probability
that the residential part of the property could be rezoned for commercial use,
and he alluded to a property across the street from Little Elm’s property that
had been rezoned from residential to commercial use.  Wright noted that Little
Elm’s appraisers had considered all of Little Elm’s property as being
commercially zoned.

          When
the State asked Wright why he opined about remainder damages under two
scenarios, he said,

When we were researching this property, we did observe
that the property had a split zoning on it.  And while we did have market
evidence that showed it was reasonably probable that a zoning change could be
initiated on a residential tract to use it for a commercial use, it wasn’t
something that was factually in existence as of the date of value.

          And so from an appraisal experience, even
though we knew it was reasonably probable, there was a slight chance that it
may not be allowed to be used for a commercial use.  And so I prepared two
appraisals, one that . . . considered using that commercial lot, which would
have been reasonably probable.  And then I looked at it under the assumption
you couldn’t get a rezoning on that residentially-zoned portion of the
property.

Wright
testified that the methodology of considering two scenarios was appropriate
because the scenarios matched “how a market participant would have to look at the
property.”

          Relying
in part on an opinion from the supreme court and on one of our opinions, the
State argues that the trial court erred by excluding evidence about Wright’s
Scenario 2 appraisal.  See City of Austin v. Cannizzo, 153 Tex. 324,
333, 267 S.W.2d 808, 814 (1954); Calvert v. City of Denton, 375 S.W.2d
522, 524–25 (Tex. Civ. App.—Fort Worth 1964, writ ref’d n.r.e.).  In Cannizzo,
the supreme court considered whether 4.57 acres that the City of Austin
condemned could be valued as commercial property “in the face of contrary
zoning restrictions.”  153 Tex. at 332, 267 S.W.2d at 814.  The court held that
the property could be valued as commercial property, explaining in part,

          In the willing seller-willing buyer test of
market value it is frequently said that all factors should be considered which
would reasonably be given weight in negotiations between a seller and a buyer.  This
would exclude consideration of purely speculative uses to which the property
might be adaptable but wholly unavailable but would permit consideration of all
uses to which the property was reasonably adaptable and for which it was, or in
reasonable probability would become, available within a reasonable time.

Id. at 332–33,
267 S.W.2d at 814 (citation omitted).  The court explained that to “warrant
admission of testimony as to the value of land for purposes other than that to
which it is being put at the time of the taking,” the evidence must show that
the property is adaptable to the other use, that the other use is reasonably
probable within a reasonable time, and that the market value of the land “has
been enhanced thereby.”  Id. at 333, 267 S.W.2d at 814; see Coble,
134 S.W.3d at 456 (citing and quoting Cannizzo).

          In
Calvert, the landowners owned a lot which the City of Denton partially condemned
to obtain an easement.  375 S.W.2d at 523.  The landowners also owned four
contiguous lots of which the city did not condemn any part.  Id.  The
issue that we resolved concerned whether remainder damages would be based on
the loss of market value on the one partially condemned lot or also on the four
uncondemned lots, which could have been combined with the condemned lot to
develop a shopping center.  Id. at 523–24.  In holding that the trial
court had erred by limiting remainder damages only to the lot subject to
condemnation, we explained in part,

[V]alue may reflect not only the use to which the
property is presently devoted but also to that use to which it may readily be
converted.

          The record in this case reflects no legal
impediments which would prevent the appellants from . . . clear[ing] the
property for conversion to use as a shopping center or other business purpose. . . . 

          . . . .

          In City of Tyler v. Ginn,[[18]] . . . the
court held:  ‘There seems to be no question but that appellees are entitled
to the highest value for which the property is adaptable.’

          . . . .

          It would appear illogical to say that because
four of the lots are occupied by single family houses rented to separate
tenants and the fifth lot is devoted to a business use that they should not be
treated as a single unit.  Such a holding would be in violent conflict with the
general rule that compensation to the owner is to be estimated by reference
to its highest and best use and not necessarily to its use at the time of
condemnation.

          . . . .

          It is agreed that only by treating the five
lots in question as a single tract can the property be devoted to its highest
and best use and that treated as such it has sustained damages in addition to
those allowed.

Id. at
525–27 (emphasis added); Bauer v. Lavaca-Navidad River Auth., 704 S.W.2d
107, 109 (Tex. App.—Corpus Christi 1985, writ ref’d n.r.e.) (“The owner of the
condemned land is entitled to have the fact finder consider, in determining its
fair market value, the highest and best use to which the land is adaptable.”); see
also City of Sugar Land v. Home & Hearth Sugarland, L.P., 215 S.W.3d
503, 511 (Tex. App.—Eastland 2007, pet. denied) (stating that one of the factors
to be used in determining the highest and best use is “maximal productivity”).

          In
the pretrial hearing, as one ground for excluding evidence about Wright’s
Scenario 2 appraisal, Little Elm argued, “The [residential] lot, which [Wright]
compares to the office building on the same size lot across the street, cannot
be used after the taking and his scenario cannot be adopted to any other use
but parking.  That is a permanent damage to the [residential] lot . . . .” 
Similarly, on appeal, Little Elm argues that Wright failed to “analyze the
maximally productive use of the existing residential tract.”

          In
his pretrial testimony, Wright conceded that if the residential part of Little
Elm’s property was rezoned for commercial use and a parking lot was placed on
it, it could not thereafter be used to contain a commercial building.  He also
stated in his testimony before and during the trial that as vacant, the highest
and best use of all of Little Elm’s property would be for “future commercial
development or holding for investment.”  But the State did not provide evidence,
either in the pretrial hearing or in the bill of exception on Wright’s
testimony that the State made at trial, to substantiate that the highest and
best use of Little Elm’s residential property, if rezoned for commercial use,
would be to merely add parking spaces rather than to pursue other types of commercial
development.  Wright did not explain why using the property for a parking lot
would be maximally productive when it could be used to, for instance, host another
business that could pay rent to Little Elm.  Wright and Hutson each admitted during
the pretrial hearing that the residential tract was big enough to contain a commercial
building.  At trial, Wright conceded that commercial buildings may provide
“ample income that’s well above the value of the land.”

          Based
on the principles explained above, we hold that the trial court did not abuse
its discretion by excluding evidence about Wright’s Scenario 2 appraisal,
through testimony from Wright or Hutson, because the State did not establish
that placing a parking lot on Little Elm’s residential property was that
property’s highest and best use or that, alternatively, Little Elm would be
compensated for damages based on the change of the residential property’s
highest and best use to a lesser use.[19]  See Calvert,
375 S.W.2d at 525–27; Ginn, 225 S.W.2d at 998; see also Cont’l Dev.
Corp. v. State, 337 S.W.2d 371, 374 (Tex. Civ. App.—Fort Worth 1960, no
writ) (holding that a trial court did not abuse its discretion by excluding a
landowner’s evidence of a possible zoning change from residential to commercial
property because the landowner did not present evidence that a commercial use
would be the property’s highest and best use).  We overrule the State’s second
issue.

The
exclusion of evidence about Ordinance 954 and Baldwin’s site plan

          In
its third issue, the State asserts that the trial court abused its discretion
by excluding evidence concerning Ordinance 954 and the Town’s approval of
Baldwin’s conceptual site plan.  Little Elm contends that the trial court’s
decision to exclude this evidence was proper because the Town’s passing
Ordinance 954 and approving Baldwin’s site plan occurred after the date of the
condemnation.  Before trial, the State argued that Baldwin’s site plan should
have been admissible as rebuttal evidence to Baldwin’s opinion that Little
Elm’s buildings required demolition.

          Ordinance
954 allowed landowners who received compensation from eminent domain actions to
request variances from the Town’s ordinances.  Baldwin’s conceptual site plan
proposed replacing the parking spaces lost in the condemnation and did not
require demolishing all of Little Elm’s buildings.

          Compensation
for land taken by eminent domain must be measured by circumstances that may
have affected the market value of the land, meaning the perceptions of willing
buyers and sellers, at the time of the taking.  Zwahr, 88 S.W.3d at 627;
Heddin, 522 S.W.2d at 888.  Thus, evidence of events occurring
after the date of the taking must generally be excluded because those events
could not have affected an antecedent market value.  See Heddin, 522
S.W.2d at 889 (“A rupture occurring subsequent to the date of taking could not
have had an effect on market value as of the date of taking.”); Sw. Pub.
Serv. Co. v. Vanderburg, 526 S.W.2d 692, 694 (Tex. Civ. App.—Amarillo 1975,
no writ) (explaining that testimony should not have been admitted because it
concerned an incident that occurred “after the date of taking, and thus, could
not have influenced market value on the date of taking”).  Evidence of events
occurring after the taking may be admissible, however, for rebuttal “under
certain limited circumstances and for a properly limited purpose.”  Heddin,
522 S.W.2d at 889 (holding that if a landowner produced evidence that the
potential of a pipeline rupture could affect market value on the date of the
taking and the condemnor asserted that the pipeline was free from danger, the
landowner could offer rebuttal evidence of pipeline ruptures occurring after
the date of the taking); see Stinson v. Arkla Energy Res., 823 S.W.2d
770, 772 (Tex. App.—Texarkana 1992, no writ) (“A trial court may allow
otherwise inadmissible evidence to rebut testimony.”).

          Under
Heddin, because the passing of Ordinance 954 and the approval of
Baldwin’s site plan occurred after the date of the taking, we conclude that the
trial court did not abuse its discretion by excluding evidence about the
particular language of Ordinance 954[20] and the approval of the
site plan to the extent that this evidence was offered by the State “as a
factor affecting market value.”  See Heddin, 522 S.W.2d at 889.  But
because the trial court erroneously admitted Baldwin’s speculative testimony
that Little Elm would actually be required to demolish all of its buildings, we
conclude that the trial court abused its discretion to the extent that the
court precluded the State’s ability to rebut Baldwin’s testimony by introducing
evidence showing that the demolition of the buildings was not certain.  See
id.  We sustain the State’s third issue to that extent.  For reasons
similar to those stated in our analysis of the State’s first issue and because
the trial court’s ruling left the jury with an incomplete picture of whether
Little Elm’s buildings would actually have to be demolished, we hold that the
State suffered harm as a result of the exclusion of its rebuttal evidence.  See
Tex. R. App. P. 44.1(a).[21]

The reliability
of Wright’s testimony

          In
its fourth cross-issue, Little Elm contends that the trial court erred by
denying its motion to exclude Wright’s testimony on the basis that it was
unreliable.  Specifically, Little Elm contends that Wright’s opinions were
unreliable because he used two scenarios that contained different remainder damage
values.  Little Elm asserts that “[t]his sequence of events required Little Elm . . . to
prepare for trial in anticipation of Mr. Wright’s testimony on multiple
reports.”

          Wright
said that he provided two scenarios of remainder damages because he was “trying
to articulate some . . . different approaches that would
likely happen” depending on whether the residential portion of Little Elm’s
property could be used commercially.  Wright concluded that both of his
scenarios, which were independent of each other and were supported by separate
reports, were reliable and supported by appraisal methodology used in his
profession.

          We
have held above that the trial court did not abuse its discretion by excluding
evidence concerning Wright’s Scenario 2 appraisal.  We cannot reasonably
anticipate whether the State will again offer multiple appraisal scenarios upon
retrial as it did in the first trial.  For that reason, and because resolution
of Little Elm’s fourth cross-issue is unnecessary to reach a final disposition
of this appeal,[22] we decline to address
this cross-issue.  See Tex. R. App. P. 47.1; Dickinson v. Dickinson,
324 S.W.3d 653, 659 n.2 (Tex. App.—Fort Worth 2010, no pet.).

Discovery Issues

          In
its first three cross-issues, Little Elm contends that the trial court erred by
allowing the State to present certain evidence because the State failed to
comply with various rules of civil procedure, including rules related to
discovery.  Specifically, in its first cross-issue, Little Elm argues that the
trial court erred by allowing the State to call witnesses whom the State had
not indicated, through answering an interrogatory, that it expected to call at
trial.  In its second cross-issue, Little Elm asserts that the trial court
erred by permitting Wright to testify because Wright relied on the opinion of
an undisclosed expert.  In its third cross-issue, Little Elm contends that the
trial court erred by allowing Wright to testify because the State failed to
timely submit his work file.  The State responds to these cross-issues by
arguing, in part, that the trial court did not err by determining that Little
Elm was not unfairly surprised or prejudiced by the State’s alleged procedural
errors.

          The
trial court signed an agreed scheduling order in November 2009.  The order set
a deadline of January 22, 2010 for the parties to designate experts and to “provide
materials regarding those experts.”  On January 25, 2010, through signed
letters, the parties agreed to give each other more time to designate experts.  On
February 2, 2010, Little Elm agreed to accept the State’s expert designation
that it had mailed a day earlier.  The State’s February 2010 expert
designation, which was included within a response to a request for disclosure,
designated Wright as an expert on value, stated that Wright’s report had “not
been completed,” and expressed that the State could supplement its designation
under rule of civil procedure 193.5.  In its February 2010 motion for summary
judgment, Little Elm contended that the State’s expert designation had “failed
to provide the expert’s mental impressions and opinions” and that in the
designation, the State had failed to produce the expert’s work file.

          In
March 2010, the State filed a motion for continuance, contending that it had
recently received new lead counsel from the Attorney General’s office, that
Wright was in the process of finishing his report, and that the State had recently
hired a second expert, Hutson.  Little Elm opposed the State’s motion for
continuance.  After holding a hearing, the trial court granted the State’s
motion and signed a new scheduling order providing that the State had until
April 12, 2010 to designate Wright and Hutson and to provide those experts’
materials; that Little Elm had until May 12, 2010 to designate any rebuttal
experts; and that the parties had until July 30, 2010 to complete discovery.  The
State designated Wright and Hutson as experts and produced their reports by
April 12, 2010 but did not provide their work files by that date.  Instead, on
April 12, 2010, the State supplemented its response to Little Elm’s request for
disclosure and stated, “Mr. Wright’s and Mr. Hutson’s work files will be made
available upon request for inspection at a reasonable time and place by
agreement of the parties.”  The State delivered its experts’ work files to
Little Elm shortly after Little Elm requested the files in July 2010.

          On
August 20, 2010, the State filed a motion for leave to file a late expert
designation.  In addition to Wright and Hutson, the State wanted to designate
Taylor as an expert witness because Taylor had testified in a deposition that
Little Elm’s improvements would retain their nonconforming status after the
State’s taking.

          In
September 2010, Little Elm filed motions to exclude testimony from the State’s
proposed expert witnesses (Wright, Hutson, and Taylor).  In the motions, Little
Elm contended that although the State had timely designated Wright and Hutson
as experts, the State had failed to timely produce their work files.[23] 
Little Elm also contended that Taylor should not be allowed to testify as an
expert because he was not timely designated.  The State responded by contending
that Little Elm was not surprised or prejudiced by the materials in Wright’s
and Hutson’s work files, that the files had been produced within a reasonable
time after Little Elm requested them, and that Taylor would be an appropriate
expert witness because Little Elm’s experts had consulted with him and because
Little Elm could therefore not be surprised by the opinions that he would
offer.

          Before
trial, the trial court excluded Taylor from being an expert witness but allowed
him to testify as a fact witness.  The court also denied Little Elm’s motions
to exclude the State’s experts’ testimony based on discovery violations.  While
the court acknowledged that the State had failed to comply with discovery rules,
it reasoned,

I don’t believe that . . . Little Elm
Plaza . . . has been so fundamentally disadvantaged by
discovery violations that have occurred that it justifies not trying the case
on the merits.  I don’t believe we’ve reached that threshold in this case . . . .

          Ultimately, the discovery has been achieved. . . .

          . . .  I want to try this
case on the merits.  And having heard what I’ve heard, I don’t believe . . . that
the discovery violations which have occurred have risen to the level necessary
to strike these experts’ [opinions].

          A
party who fails to make, amend, or supplement a discovery response in a timely
manner may not introduce in evidence the material or information that was not
timely disclosed, unless the court finds that

(1) there was good cause for the failure to timely
disclose or (2) the failure will not unfairly surprise or prejudice the other
parties.  The purposes of this rule are to promote responsible assessment of
settlement and prevent trial by ambush.  The party seeking to offer the
evidence at issue has the burden to establish good cause or lack of unfair
surprise or prejudice.  The trial court has discretion to determine whether the
offering party has met its burden; however, a finding of good cause or the lack
of unfair surprise or unfair prejudice must be supported by the record.

O’Dell
v. Wright, 320 S.W.3d 505, 511 (Tex. App.—Fort Worth 2010, pet.
denied) (citations omitted); see Tex. R. Civ. P. 193.6.  We review a
trial court’s finding that a party was not unfairly surprised or prejudiced by
a discovery violation under an abuse of discretion standard.  See Tex. Mun.
League Intergovernmental Risk Pool v. Burns, 209 S.W.3d 806, 818 (Tex. App.—Fort
Worth 2006, no pet.); Commercial Structures & Interiors, Inc. v. Liberty
Educ. Ministries, Inc., 192 S.W.3d 827, 832 (Tex. App.—Fort Worth 2006, no
pet.).

          Little
Elm claims in its first cross-issue that Wright and Taylor should not have been
allowed to testify because the State failed to list them as witnesses while
responding to Little Elm’s interrogatories.  The State has asserted, without
contradiction by Little Elm, that each party had named Taylor as a person with
knowledge of relevant facts, that Taylor was deposed by the parties, and that
Little Elm’s experts referenced Taylor in their reports.  Through responding to
a request for disclosure months before trial, the State designated Wright as a
“testifying expert,” and Little Elm later took Wright’s deposition.  Also,
months before trial, the trial court held a hearing that specifically regarded the
State’s intention for Wright to testify, and shortly after that, the State
provided Wright’s appraisal report to Little Elm.  Thus, we conclude that the
trial court did not abuse its discretion by concluding that Little Elm was not
prejudiced or surprised by Wright’s or Taylor’s testimony although they were
not named by the State as trial witnesses in response to Little Elm’s
interrogatory, and we overrule Little Elm’s first cross-issue.

          Next,
Little Elm contends that the trial court should have excluded Wright’s
testimony because he relied on the undesignated expert opinion of Robert Brown,
the Town’s attorney, and Little Elm learned of this reliance only a week before
trial.  See Tex. R. Civ. 192.3(e) (stating that parties may discover
information concerning consulting experts whose mental impressions or opinions
have been reviewed by a testifying expert).  The evidence in the pretrial
hearing established that Wright had spoken with Brown about the Town’s plans
with respect to Little Elm’s property, that Brown had told Wright that the Town
did not intend to make property owners cure all of the preexisting
nonconformities on their property, and that Wright had considered Brown’s
opinion.  But Wright denied that he relied on a May 2009 letter that Brown had
written concerning that issue, and Wright testified that he did not consider
Brown to be a consulting expert.  Wright acknowledged that he did not discuss
his conversations with Brown in his appraisal reports, but he said that there
was nothing that required him to “cite everyone that [he] talked to.”

          Even
if the State should have designated Brown as a consulting expert, Brown’s
opinion about the effect of the Town’s ordinances (that Little Elm’s buildings were
grandfathered and would not need to be demolished) was not substantively
different than the opinions that Wright and Taylor had expressed to Little Elm
long before the trial began.  The record does not indicate that Wright’s
opinion changed from one position to another as a result of conferring with
Brown; instead, it indicates that Brown provided support for an opinion that
Wright would have likely reached based on other facts that he had considered
and other people that he had talked to.  Wright testified that his “ultimate
conclusion” centered on the Town’s ordinances because the ordinances “are what
the city administrators are supposed to go by.”  Also, Little Elm knew two
months before trial that Brown, through a letter, had expressed opinions about
the effects of the Town’s ordinances.  Although Little Elm claims in its brief
that it was not afforded the opportunity to take Brown’s deposition, Little Elm
does not direct us to any point in the record when it asked the trial court to
grant that opportunity, to allow for a continuance so that a deposition could
occur, or to allow discovery related to Brown’s opinions about the Town’s
ordinances after obtaining knowledge of his letter.  Finally, at trial, the
trial court excluded references to Brown’s opinion about the effect of the
Town’s ordinances.  Based on all of these facts, we hold that the trial court
did not abuse its discretion by determining that Little Elm had not suffered
undue surprise or prejudice based on the fact that the State did not designate
Brown as a consulting expert, and we overrule Little Elm’s second cross-issue. 
See O’Dell, 320 S.W.3d at 511; Burns, 209 S.W.3d at 818.

          Finally,
in its third cross-issue, Little Elm contends that the trial court erred by
allowing Wright to testify because although the State timely designated him as
an expert and timely delivered his report, the State failed to timely deliver his
work file.  Concerning prejudice or unfair surprise resulting from the
allegedly untimely delivery of Wright’s work file, Little Elm contends in its
brief only that it was unable to “designate any rebuttal witnesses to the
State’s experts.”  But Little Elm does not contend that it asked the State
or the trial court to grant a late designation of rebuttal witnesses or that either
the State or the trial court denied such a request.  Also, on appeal, Little
Elm has failed to specify any information contained in Wright’s work file that
it desired to rebut or was unable to rebut.  Furthermore, the record establishes
that Little Elm received the work file two months before the trial began and several
weeks before Little Elm deposed Wright.  Thus, we hold that the trial court did
not abuse its discretion by determining that Little Elm was not unfairly
surprised or prejudiced by the allegedly late delivery of Wright’s work file.  See
O’Dell, 320 S.W.3d at 511; Burns, 209 S.W.3d at 818.  We therefore
overrule Little Elm’s third cross-issue.

Evidentiary
Sufficiency

          In
the State’s fourth issue, it contends that the evidence is insufficient to
support the jury’s verdict of remainder damages in the amount of $2,232,913. 
Because our disposition of other issues requires us to reverse the trial
court’s judgment and remand this case for a new trial and because a new trial
is the only relief that the State has requested, we decline to address whether
the evidence in the previous trial was sufficient to sustain the jury’s
verdict.  See Tex. R. App. P. 47.1; Dickinson, 324 S.W.3d at 659
n.2.

Conclusion

          Having
sustained the State’s first and third issues, which are dispositive, we reverse
the trial court’s judgment and remand this case for a new trial.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

 

WALKER, J., concurs without opinion.

 

DELIVERED: 
October 25, 2012

 

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00037-CV

 


 
 
 The
 State of Texas 
  
 v.
  
 Little
 Elm Plaza, Ltd., a Texas Limited Partnership and Legacy Bank of Texas 
  
 AND
  
 Little
 Elm Plaza, Ltd., a Texas Limited Partnership
  
 v.
  
 The
 State of Texas
 
 
 §
  
  
  
  
 §
  
  
  
  
 §
  
  
  
  
 §
 
 
 From the Probate Court
  
  
  
  
 of
 Denton County (PR-2009-00041)
  
  
  
  
 October
 25, 2012
  
  
  
  
 Opinion
 by Chief Justice Livingston
 
 


 

 

JUDGMENT

 

 

          This
court has considered the record on appeal in this case and holds that there was
error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is reversed and the case is remanded for a new trial.

It is further ordered that Little Elm Plaza, Ltd., a
Texas Limited Partnership shall pay all of the costs of this appeal, for which
let execution issue.

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

    Chief Justice Terrie Livingston

 









[1]See Tex. R. App. P. 47.4.





[2]Although appellee Legacy
Bank of Texas was a party in the trial court by being named in the State’s
condemnation petition and was included in the trial court’s judgment, it did
not participate in the trial, did not appeal the trial court’s judgment, and
has not filed a brief on appeal.





[3]The evidence at trial
indicated that the Town did not adopt a home-rule form of government until 2001
or 2002.





[4]Under the ordinance, a
“Right-of-Way Acquisition” is the “securing of [a] right-of-way through
negotiation, purchases, bargain, trade, donation, condemnation or other
means . . . .”





[5]See Tex. Const.
art. I, § 17(a) (“No person’s property shall be taken, damaged, or destroyed
for or applied to public use without adequate compensation being made . . .
.”); Coble v. City of Mansfield, 134 S.W.3d 449, 451 n.1 (Tex. App.—Fort
Worth 2004, no pet.) (“Eminent domain is the right or power of a sovereign
state to appropriate private property for the promotion of the general
welfare.”).  The 12,504 square feet comprised a fifteen- to nineteen-foot
variable width strip of land across the front of Little Elm’s property.  The condemned
part equaled about 7.5 percent of the property.





[6]See Tex. Prop. Code
Ann. § 21.014(a) (West Supp. 2012).





[7]See id. § 21.018(a)
(West 2004).





[8]See id. §
21.021(a)(1) (West 2004).





[9]See City of Fort Worth
v. Corbin, 504 S.W.2d 828, 830 (Tex. 1974) (stating that the date of the
taking is the date in which the condemnor takes actual possession of the
property or takes constructive possession by depositing the special
commissioners’ award).





[10]See Tex. R. Evid.
702 (“If scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.”).





[11]On appeal, the State does
not contend that Hawkins’s initial valuation of Little Elm’s property was
improper or that the admission of his testimony on remainder damages was
erroneous for reasons other than his opinion about the effect of Taylor’s letter
and Ordinance 918.  We will not detail Hawkins’s appraisal testimony as it
relates to issues other than those that the State challenges.





[12]Wright testified that the
value of the condemned part was $209,021.





[13]The Florida Supreme Court
has explained the distinction that we have illustrated by our decisions in Coble
and Ledrec, Inc. as follows:

          When admitting evidence of
future contingencies . . . the trial court must ensure that
the finder of fact does not mistakenly assume that their cost or value can be considered
apart from the effect on market value, such as by simply assuming that these
contingencies must inevitably occur and then valuing the property accordingly. 
After all, we are dealing with contingencies here, not certainties.  There
always is a risk that such costs or future values may prove greater or less
than a knowledgeable buyer might assume. . . .  To prevent juror
confusion, the trial court and the parties may wish to see that testimony as to
future costs and values is not given in the form of contingent future
dollar amounts, but only in terms of the effect on the property’s value as of
the moment of the taking.

Broward Cnty. v. Patel,
641 So. 2d 40, 43 n.7 (Fla. 1994).





[14]Hawkins admitted that
statements by the Town’s officials, such as those in Taylor’s letter, could not
have bound the Town to any position concerning Little Elm’s property.





[15]The State contends that
Ordinance 918 did not require demolition of Little Elm’s buildings because the
ordinance, by its language, applied to condemnations that caused a property or
improvements to be in violation of the Town’s zoning ordinances, while Little
Elm’s property was already in violation of the ordinances before the State’s
condemnation.





[16]See Ledrec, Inc.,
366 S.W.3d at 311 & n.6; see also Heddin, 522 S.W.2d at 888. 
Hawkins testified in the pretrial hearing that he had been an appraiser for
twenty-one years, that Ordinance 918 and Taylor’s letter would be customarily
relied on in the marketplace, and that a market participant would not assign
any value to Little Elm’s buildings because of the uncertainty of whether the
buildings would remain legal.  Hawkins opined in the pretrial hearing that “any
public official can change property values by simply announcing something to
the market, . . . whether they are authorized to do it or
not.”  Similarly, Hawkins partly offered market-based testimony at trial
concerning the effects of Taylor’s letter and Ordinance 918.  Because we are
sustaining the State’s first issue based on the trial court’s erroneous admission
of Baldwin’s speculative testimony, we decline to address whether all aspects
of Hawkins’s testimony were admissible.  See Tex. R. App. P. 47.1.





[17]Our decision to sustain
the State’s first issue requires us to reverse the trial court’s judgment and
remand this case for a new trial.  See Hiroms v. Scheffey, 76 S.W.3d
486, 488 (Tex. App.—Houston [14th Dist.] 2002, no pet.).  But because some of
the other issues raised by the parties are likely to arise again upon retrial,
we will address them in the interest of judicial economy.  See Edinburg
Hosp. Auth. v. Trevino, 941 S.W.2d 76, 81 (Tex. 1997).





[18]225 S.W.2d 997, 998 (Tex.
Civ. App.—Texarkana 1949), writ dism’d, 148 Tex. 604, 227 S.W.2d 1022
(1950).





[19]In contrast, in Wright’s
Scenario 1 appraisal, which proposed the partial demolition of a building on
Little Elm’s property, Wright included $915,979 in permanent damages based on a
reduction of “some of the income that could be generated by th[e] property.”





[20]The trial court admitted
testimony that on the date of the taking, it was foreseeable that the Town
would pass a curative ordinance, but the court excluded evidence about the
specific language of Ordinance 954.  The State has not directed us to any
evidence in the record establishing that Ordinance 954’s specific language had
been drafted in final form and was reasonably foreseeable to be passed on the
date of the taking.  Thus, we conclude that the trial court did not abuse its
discretion by excluding evidence about the particular language of Ordinance 954
to the extent that the State offered that evidence as a factor affecting market
value.  See Heddin, 522 S.W.2d at 889.





[21]Because evidence
concerning the specific language of Ordinance 954 and Baldwin’s conceptual site
plan were admissible only as rebuttal evidence under the circumstances of the
first trial, we cannot opine about whether this evidence will be admissible
upon retrial.





[22]Little Elm asks us to
reverse the trial court’s judgment and render judgment in its favor in the
amount of $4,075,000.  Little Elm does not cite authority, however, that would
authorize us to render judgment based on the evidentiary issues that it has
presented.  See TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 233, 245
(Tex. 2010) (remanding a case for a new trial based on the improper and harmful
admission of evidence).





[23]See Tex. R. Civ.
P. 194.2(f)(4)(A), 194.4.